Good morning, Your Honors. May it please the Court, my name is Russell Petty, representing the plaintiff and appellant Ruben Gonzales. I submit to the Court that my most significant problem with respect to the way this matter was handled deals with the two interrelated issues of, number one, when Dr. Dove provided her evidence that Mr. Gonzales was disabled, Unum's rejection of that information by requiring additional testing, and then when Mr. Gonzales turned around and provided the additional testing, Unum's refusal to even consider that additional evidence. And I'd sort of like to go into a little bit more detail with respect to both of those issues. The record at the time that Dr. Dove provided her information was that she'd examined Mr. Gonzales, she opined that he had symptoms, objective symptoms showing that he suffered from Parkinson's disease. She had conducted a mental status examination which showed that he suffered from cognitive defects. She observed these things, she wrote them in the attending physician's statement to Unum. Dr. Topper, who was the physician assigned by Unum to look at this case, spoke to Dr. Dove, and Dr. Dove was quite compelling in stating that he's got these symptoms, I've observed them, there's no way that he could work in a job that requires a high level of functioning. Now, at that point, Dr. Topper's response, which was adopted by Unum, is to say, look, you haven't provided enough evidence. The mental status examination doesn't have any validity controls, it's just a screening test, it's not the sort of battery of psychological testing that you could use to objectively prove a loss of mental functioning, and so we're going to deny this claim because there's not enough evidence. Now, I submit that that's improper, and the reason why it's improper is that there's no suggestion that the evidence provided by Dr. Dove is not the sort of things that a doctor would do in the course of diagnosing and treating Parkinson's disease. But that's not the right question, right? Someone might do that and then do further testing, and weren't there articles that said the screening test is just a screening test and that's all he had and you would need to do more to figure out the actual diagnosis? Well, not in the case of Parkinson's, Your Honor. The screening test was designed as a tool for physicians to evaluate the mental deterioration or lack thereof in their patients. In the case of Parkinson's, there's no suggestion any place in the record that a reasonable physician treating Parkinson's, treating, not necessarily having to prove disability, but simply treating Parkinson's, would have to go off and conduct this battery of psychological testing. It's not important for diagnostic purposes, it's not important for therapeutic, for treating purposes, Your Honor. It's just a testing that UNM believed it needed to have before it was going to pay benefits. And with respect to that, I think that what you have to do is you have to turn to the plan language. You know, we, as lawyers, are always being told that the plan language is primary and you have to sort of follow whatever it is the plan says. And the plan is quite specific as to what a claimant is required to provide in terms of proof of law. So the district, on this point about the testing, the district court said that Dr. Dove's testing, the reliability of the testing was backed by articles and that there were articles that Gonzales himself relied upon that showed that this was just a screening test. Do you disagree with what the district court said about that? And if so, on what basis? No, it is just a screening test. It doesn't, it's not the sort of testing that would ordinarily be used if you wanted to prove that someone had a certain level of cognitive dysfunction. But again, that's not the sort of testing that's typically done in treating Parkinson's. But his burden here is to prove that he has a disability, isn't it? All Dr. Dove was interested in doing was establishing to her satisfaction that he had this diagnosis of Parkinson's so that she could treat it for her purposes and there's no evidence. But for our purposes today, he needs to prove that he has a disability. So why can't Unum say that he didn't prove it, that maybe the doctor decided she, this was enough for her, but it's not proof for the purposes of showing. That's exactly the point I was getting to, Your Honor. Thank you. We're talking about the plan language here. What does a claimant have to show in order to establish proof of claim? Well, it happens to be in the plan documents. It's over at page 847 in the record. And it talks about what a claimant has to show in order to show proof of claim. Has to show under the regular care of a physician, has to show documentation of earnings, has to show the date and the cause of disability, restrictions and limitations, institutions treated. If there is additional testing that's required before the claimant can quote prove his or her case, it's not here in the proof of claim. Instead, what the plan documents require is that the insurance company is empowered to have the claimant examined, have the claimant submit to any tests. And I submit that when you've got a situation where you've got adequate proof of loss by Dr. Dove... Okay, hold on. So I'm looking at page 847, and it says you have to show the date your disability began, the cause of your disability, the extent of your disability, including the restrictions and limitations preventing you from performing your regular occupation. You're saying that to meet these requirements, you don't have to prove that you actually have a disability? No, you have to have the doctor's opinion that there's a disability. She's got to provide the evidence that she's done in the diagnostic and therapeutic testing, and she has to provide the restrictions and limitations that she has there. So some doctor says, you know, I saw this person and they have red hair, and I think all red people with red hair have a disability and shouldn't work. That's enough? No, no, of course not, Your Honor. And the reason why it's not enough is because that's not what someone typically does. Say, for example, somebody has a spinal injury. They're saying, I've got an injury to my lumbar spine, and therefore I can't work. Well, what you would expect to see in the records is MRIs or x-rays showing the extent of the spinal injury. Now, if the doctor doesn't provide that, and Unum or the insurance company was to say, hey, where are the MRIs? It's not necessarily demanding additional testing. What it does is that it casts doubt on the physician's opinion that this person has got a spinal injury because the physician hasn't done the sort of things you would expect. Here, doctor, sorry, Your Honor. No, no, I'm sorry, but I think part of the problem with this case is we have to look at the entire record as a whole, and we have to look at what Unum did with respect to Dove in the context of what happened before. And I think one of the concerns that Unum had was that approximately a year before, he saw doctors and was showing virtually no signs of impairment, according to those doctors. And in the year between his visits with those doctors and his visit with Dove, he didn't seek follow-up treatment. There was nothing in the record that indicated that he was worsening. And all of a sudden, we get this opinion from Dove, and Unum says, well, wait a minute. What was behind your opinion? Because it seems to be in significant tension with the rest of the record. And why is it inappropriate in this particular context for Unum to do something like that? Well, I mean, I'm not sure that's what was done, Your Honor, but I do think that when you've got a progressive condition like Parkinson's, and there's no dispute that it's progressive, that what you see later is oftentimes better evidence. And what that tends to do is that actually raised that concern. I mean, there's material in the record that indicates that Unum's people raised that very concern, that there's no indication that his condition worsened over the course of the year. He wasn't seeking treatment. He just all of a sudden shows up with Dove's report, as I recall it. I mean, he was getting treatment during the period, although it was probably less regular, because his treating physicians were in San Diego, and he was in Hawaii, Your Honor. But this is not a case where, you know, Mr. Gonzalez was pretending to have symptoms of Parkinson's in June of 2007, and then just by some odd chance happened to contract Parkinson's with the exact same symptoms he was pretending to have. I mean, in this case that I wish I'd cited in my papers, I'm going to give it to the court now. It's Silver v. Executive Car Leasing, Long-Term Disability Plan, and that's 466 F. 3rd, 727. It's an opinion of this court. And what it talks about is you have to look at the medical record as a whole, and it's a mistake to focus on just the medical record as it existed during the elimination period, because just by common sense, you know, somebody, you know, if all of a sudden they're a significant event, and that event happens right after the elimination period runs, well, you can say, well, as this was a Unum case, you can say that as Unum did, well, you weren't disabled during the elimination period, but, you know, what happened after the elimination period, in the case of Silver beforehand, educates people as to what the condition was while the elimination period was taking place. Could I ask a little bit of a different question about your presentation? In your briefs, you discuss the short-term disability plan and the fact that the short-term disability plan did conclude that your client was disabled. Correct, Your Honor. But other than your discussion of that, I can't really that, about this case, and about Unum's denial, or Unum's denial, I would never know how to, whether it's Unum or Unum. Unum. Unum. How is, you're attacking Unum's denial of benefits, and you talk a certain amount about what happened with the short-term disability plan, but I as relevant to this case? Thank you, Your Honor. Well, you know, this is an abuse of discretion case, and, you know, this court's holding in a body is that when evaluating an abuse of discretion case, the district judge is required to examine the level of conflict. An insurance company in a situation like this is conflicted because, on the one hand, it's making the claim's decision, and on the other hand, unlike, for example, a But what does that have to do with what happened with the short-term disability plan? Well, because, I mean, it's all one. I mean, it's Unum Provident. There are two entities, right? That's a significant fact. You were calling them both Unum in your brief, but it's actually two different companies. It's two different companies, but, you know, the claims handling is consolidated. It's the same people. You look at the denial letters, and the denial letters don't say Unum or Provident. They say Unum Provident. I mean, it's all the same, you know, it's been sort of, I mean, it's all the same people. It's an integrated company, regardless is the name under which it's operating, and our position is that in evaluating the level of conflict, when you've got one of these Unum entities that agrees that Mr. Gonzalez is disabled and pays him benefits, and then all of a sudden, when Mr. Gonzalez tells the adjuster, oh, my LTD has been denied, the adjuster turns around and says to his supervisor, you know, I just found out that the LTD claim has been denied. He sort of, you know, lies to his supervisor and says, I found out by checking the file instead of, you know, I found out because the claimant told me, and the next thing that happens is the denial of the LTD. But that's not really, I mean, the kind of quote-unquote conflict that you're talking about is the same thing as what we usually think about when we talk about conflict in the ERISA benefits context. I mean, what we usually talk about when we're talking about conflict is the money people are having an undue influence over the medical people, right? And I don't understand how your discussion relates to the question whether, in this case, the money people had an undue influence over the medical people. Well, you know, Your Honor, in these cases, we're generally limited to the record discovery is frowned upon, and so you have to look for your... Did you ask for discovery on the conflict issue? I was not trial counseling, Your Honor. Did Gonzalez's lawyer ask for discovery on the conflict issue? I have to admit, Your Honor, I don't know the answer to that. Okay, because that, I mean, in the trial court, I usually give ERISA plaintiffs limited discovery on the conflict issue to explore whether the money people unduly influenced the medical people, but I didn't see any... There is something sort of weird about what happened with the short-term disability policy, but I didn't see any evidence that the money people were influencing the medical people at UNAM to deny coverage for Gonzalez. What happened with the short-term disability is they denied his claim on a made-up reason. But you're not challenging the denial of short-term disability in this case, are you? We are, Your Honor. In this case, you've appealed the denial of short-term benefits? In this very case. Where is that in your... Where is that? How do we know that from your brief, that you're challenging that? Well, I mean, we ask in the, you know, when we... Our claim for relief, is it the denials of both short-term and long-term? Is there a lawyer here representing Provident? Okay. I'm sorry, maybe I just misunderstood this. I thought your challenge was only to long-term benefits. Can you point me to where you've explained that you're challenging both? If the court will bear with me for just a second, Your Honor, and I will. Okay. Your Honor, as I sit here, I'm not... I promise I'll write a supplemental letter tomorrow when I get back to the office and point out where in the record it shows that we're challenging both. It would be helpful if you could also show where you argued that below, where you argued that in the district court, too. Very well, Your Honor. We'll be able to provide all that information. And I do... I know you're out of time, but I do have one more question for you about the short-term disability policy. I mean, you didn't make... As far as I can tell, you didn't make this argument in your brief. I was trying to figure out if maybe the following point is what you were getting at in your discussion of the short-term policy. That given the fact that Provident granted the request for disability benefits, that that was significant evidence that UNUM should have taken into account this other entity's or this related entity's determination that your client was in fact disabled. And that there may be a problem with the fact that UNUM denied your client's claim without considering the reasons why Provident determined that, in fact, Gonzalez was disabled. You know, Your Honor, I probably could have been more clear. I'm told that a lot, but I mean, I believe that we did point out the argument that on people and then turn around and, you know, the long-term disability people drag on for months that eventually they hire a cardiologist to review a claim that everyone knows at that point is based on Parkinson's and then turn around and deny it. And I believe I point out that that's, again, additional evidence of conflict, although, again, I don't think it's as significant as the issue with... Is it evidence of conflict or is it evidence of... potential evidence of abuse of discretion? Well, it's... I think the court is right, Your Honor. I mean, I think it is evidence of abuse of discretion. I think it is also evidence of conflict, Your Honor, because it shows that, you know, the same insurance company is basically coming to two different determinations with respect to the same claim. I submit that's because the, you know, the short-term disability liability is so much less than the long-term disability liability. Long-term... Well, long-term was 18 months, right? It's going to get for 18 months. But the short-term was limited, I think, to $5,000 a month, whereas the long-term disability was capped in that fashion. So... Okay. Okay. I believe a little bit of my time... Thank you. Thank you. You've more than used your time. It's my fault. Sorry about that. Good morning, Your Honors. Michael Bernacchi for the UNAM Defendants and the Disability Plans. I'll start off by stipulating they were contesting the SDD disability benefits. That's actually in the district court's opinion. He makes a separate ruling on that. And it was appealed here. You're saying it was. Well, I'm not sure if it was appealed. They didn't reference it in the appeal, but you asked him if it was addressed down below. Right. I was wondering both, though. I didn't see that it was appealed here. No, you're right. I don't think it was appealed here, but in reference to your question down below, that was an issue. I did not see the appeal it addressed in this appeal. And just to answer your question about the STD and the LTD while we're on the subject, you have to understand the difference between STD and LTD. Short-term disabilities, when people have accidents, that they're out temporarily, you want to get them money as soon as possible. You are basing payments simply on the attending physician's statements. So somebody says he can't work, you don't do a lot of investigation. You pay the claim. What you do for LTD is do an investigation. The problem with saying we're going to use this as collateral estoppel and prevent you from denying the LTD claim is you're going to start seeing insurance companies deny these STD claims, basically, because they don't have enough information. To talk about Dr. Dove, I think you hit it on the head. Well, let me back up for a second. I would like to point out that the decision down below was incredibly comprehensive and well-reasoned. It was done by Judge Battaglia, and I think the reason for that is he was a former magistrate and he did a lot of social security hearings. He's very familiar with this area. I haven't seen as a thorough opinion in a long, long time. We'll take judicial notice that Judge Battaglia is thorough. But if you look at this claim in the totality, I mean, I think what you have here is a claim that was submitted initially as a cardiac claim. It was switched. We reviewed it, basically. To Parkinson's. But you're not saying he was faking that he had Parkinson's? No, no. But what I'm saying is one of the... You're not saying that he was faking that he was having symptoms? No. What I'm saying, basically, is initially it was submitted as a cardiac claim. So we had Dr. Lebrow, who's a cardiologist, actually review the claim and also discuss the Parkinson's, which is eminently reasonable. We discussed the case with the two attending physicians, Dr. Sachs and Dr. Johnson, who were certifying his disability. They backed off any type of certification. We reviewed the record of the doctor, Dr. House, who was treating him for Parkinson's. She defined it as almost imperceptible Parkinson's and there was no need for early treatment and that he had a normal mental state exam. We denied the claim. During the appeal, which is about a year later, and I think when they appealed it, they referenced a report from a new neurologist, Dr. Dove, in May of 2008. Mr. Gonzalez had to show he was disabled as of May of 2007, going forward. She basically saw him once, concluded that he was disabled, performed a mini mental state exam on the second visit, and said that supports cognitive dysfunction. Our doctors, and we had four different doctor reviews. We had a nurse review. We had Dr. Topper, who's an independent neurologist. We had Dr. Brown, who's a psychiatrist. We had Dr. Caruso, who's a neurologist and a psychologist. They all concluded that this was insufficient evidence to support a cognitive impairment. They pointed out that the mini mental state exam shouldn't be used to diagnose cognitive impairment. They also pointed out, as you did, Judge, that you would have expected to see much more  So we deny the claim. We ask plaintiff's counsel, Mrs. Cassino, whether or not they're going to do any testing. She tells us Dr. Dove doesn't think there's any testing necessary. The case should be over at that point. What happens is, all of a sudden, we get a new letter from Mrs. Cassino, or Ms. Cassino, with a new neuropsychological report from Dr. Stotland. She asks us to do a second appeal. Now, ERISA doesn't require a second appeal. The planned documents don't require a second appeal. We agreed to do a second appeal. We asked her to get the raw data before we had our doctors analyze it. I'm going to get into that in a second. The problem with the second appeal is the only document she submitted was the report from Dr. Stotland. That's problematic for a couple reasons. First, the neuropsychological testing was done in September of 2008. Mr. Gonzales had to show he was disabled as of May of 2007. Dr. Stotland backdates the data disability, but he doesn't explain why he does that. He's not a medical doctor. He didn't speak with any of the treating physicians that Mr. Gonzales has. His review of the medical records, and again, he's not an MD, is less than a paragraph long, and it has a lot of errors. And his statement that he thinks that Mr. Gonzales was mentally or cognitively impaired as of July of 2007 or May of 2007 is directly contradicted by the neurologist who examined him at that time. So we've got the problem with the report there. The other problem with the report is its content. One thing that Una made clear is that we needed validity testing and effort measurements if they were going to produce any other evidence. That was made abundantly clear to Mrs. Cassino time and time again. She picked the psychologist who was going to do these reviews. He did not do any stand-alone validity testing. Our psychologist looked at the report, and you can see on page four of the report. And you asked for that validity testing repeatedly, right? What's that? Unum asked for that validity testing repeatedly. If there's one thing that should have been clear. You look on page four, he lists the evaluation procedures. There's not one stand-alone test. Now, Mr. Petty in his brief says, well, at least some of the tests he had have embedded validity measurements, basically. So let's accept this, because our doctors addressed that as well. He doesn't report any of the scores of the embedded measurements. For instance, in the responsive brief, they referenced the MMPI test. And that could be found on page 1772 of the administrative record. There are no scores reported. The only thing Dr. Stotland, excuse me, provides in the way of validity measurements is on the top of page four. Explain to me, what is the measurement that they're measuring? Well, what you're doing, I'll give you an example of the MMPI. You can test validity in two different ways. What you're supposed to be doing is doing stand-alone tests, like a TOMS or a VIP test, which basically, specifically shows how much effort they're trying to do. Are they giving malingering? Some tests, like the MMPI, it's about 500 yes or no questions, have, I don't know, like 80 questions called subscales that are designed specifically to see whether somebody's faking responses. So what you have here in the MMPI is they don't, Dr. Stotland doesn't report any score. And he doesn't report any embedded validity score. All he basically says, with respect to the validity on the top of his report is, the patient appears to make a good effort during the testing procedures and a valid reflection of his current functioning was likely obtained. That's all he says. So you don't have the actual stand-alone test. You don't have the embedded test being reported. If that was it, I think we would win. We were still willing to consider it. We asked for the raw data, objective evidence. Give us this stuff. We'll calculate it ourselves, basically. They wouldn't do that. They kept on putting up barrier after barrier after barrier. This is the mirror, I know plaintiff cited a case, and I want to make sure, this is the actual mirror opposite of the case that plaintiff's counsel cited from the Seventh Circuit. You know, when you find these procedural issues that come up, usually they're decided based on the reasonableness. Was the insurer reasonable? Was the insured reasonable? In this particular case, and I think, I'm sorry, the case is Holstrom. In this particular case, it was the plaintiff and his counsel that kept on moving the bar. We didn't have, again, objective, stand-alone, validity data. They refused to report the scores of the embedded data, and they wouldn't give us the raw material to simply basically calculate it ourselves. One other point I'd like to make on this, and then if you have any questions. This is a case, I think, if you go through the administrative record, where Unum really did a good job. It's not one of those situations where, okay, we can see how you arrived at the decision, and we'll hold our nose and approve it, basically. They really made an effort, and I think that the district court realized that. And I think that with respect to the claims handling, this is the kind of conduct that you want to advance, that you want to basically say, hey, this is what we're looking for from insurance companies, basically. Okay, let's not go into overkill here. Yeah, okay. Do you want to touch on the conflict of interest? What do you regard that argument to be? Abusive discretion. Conflict of interest is simply, it shouldn't change the outcome. It should never be a substantive review. If somebody fails to respond to a doctor or something, it might lessen the deference. But ultimately, if the person's not disabled, they still shouldn't get benefits. Going into the conflict of interest, the court did look at what we did here. He didn't find anything wrong. I think the biggest thing was, admittedly, this STD-LTD was a little bit confusing. I think what happened on the STD is that the claims examiner knew that the letter was going out, basically, realized that medical reviews had been done, doctors had been talked to, and he basically terminated the STD benefits at that time. He specifically told Mr. Gonzalez on the phone, look, if you want to provide me any additional information, we'll go ahead and consider it, but we're going to close this six-month. And one last point I'd like to make that the district point made it, any errors in the STD initial decision are remedied by the appeal decision. And that's what we're really focusing on, Arissa, because that's the very reason we have an appeal process, basically. And he didn't have to give back any of the short-term benefits? No. He was entitled to keep all of it, basically. Great. Thank you. Thank you. We'll give you 30 seconds for rebuttal. Thank you, Your Honor. So first off, before, in the statement of issues that deals with the STD, although I admit it could have been clearer, Your Honor, with respect to the raw data, well, first off, Your Honor, I submit that with respect to the validity scales, you never asked for that information. With respect to the raw data, Ms. Cassino asked for two simple things. Number one, because the raw data is protected. She wanted to know who was going to get it to make sure it was somebody who was qualified to get it. The other is to just have an opportunity for Dr. Stotland to respond. Those weren't unreasonable and unimportant. They had no legal obligation to abide by the conditions that the attorney placed on giving that raw data, did they? Well, I mean, you know, if it went to somebody who was authorized to have this, they're under the same legal obligations as, you know, the people who get this stuff. It's protected by copyright, Your Honor. And so, you know, people who, because the people who publish these. Do you have a site for the idea that the medical records are protected by copyright? I do, Your Honor. It's in the, not the medical records, excuse me, the raw data for the testing. And I do, that was discussed in the case that I cited to this court in our reply papers, which is Meyer versus Unum Life Insurance Company of America on page 26 of, no, excuse me, I'm sorry. Okay, thank you, counsel. You're out of time. Let me just say something. You don't dispute that the critical onset date is May 7th? June of 2007, Your Honor. 2007. That is correct, Your Honor. Okay, thank you. Thank you, counsel, for your arguments. The case is submitted.
judges: Schroeder, Friedland, Chhabria